2012 Ark. 65

**Tyrone Allen ELLIS, Appellant**

**v.**

**STATE of Arkansas, Appellee.**

**No. CR 11–604.**

Supreme Court of Arkansas.

Feb. 16, 2012.

David W. Talley, Jr., Magnolia, for appellant.

Dustin McDaniel, Atty. Gen., Karen Virginia Wallace, Office of Atty. Gen., Little Rock, for appellee.

ROBERT L. BROWN, Justice.

Appellant Tyrone Ellis appeals his conviction of first-degree murder and his sentence of life in prison on grounds of insufficient evidence and an improper inquiry by the prosecuting attorney into the nature of Ellis's prior felonies. We find no reversible error, and we affirm.

The events leading up to the murder transpired on March 14, 2010, and occurred after Keith Thomas and Ellis argued outside Thomas's home in Magnolia. According to witnesses, Ellis became upset when Thomas, his stepfather, refused to let him drive his white Chevy Blazer. A jury determined that Ellis shot Thomas in the chest and killed him. Ellis was also convicted on a second count, felon in possession of a firearm, in connection with the same incident. He was sentenced to a term of life imprisonment on the first-degree murder count and 360 months on the felon-in-possession count.

The testimony at trial consisted of the following. On March 14, 2010, Ellis and Thomas were seen riding together in Thomas's car, a white Chevy Blazer, in Magnolia. Around 11:30 in the morning that day, Ellis and Thomas returned to Thomas's home. One witness, Paul McBride, testified that Thomas stated Ellis was mad because Thomas would not let Ellis use the Blazer. About twenty or thirty minutes later, Ellis and Thomas left Thomas's house a second time. When they returned, Ellis got out of the Blazer with a gun in his hand. Thomas went into his home and retrieved a gun and, according to the witness, said, "Somebody needs to go talk to that boy."

At that point, McBride, brother-in-law to Thomas and uncle to Ellis, testified that he was outside working on his car on that day when he saw Ellis fire his pistol, a long-barreled handgun with a brown handle, at Thomas. McBride added that he heard

Ellis tell Thomas "he was going to kill him." In response to that, according to McBride, Thomas fired a shot into the air. At that point McBride called 911. When he returned, Thomas and Ellis were inside McBride's home. McBride testified that Ellis told Thomas, "If you don't let me go, I'll kill you." Thomas did let Ellis go, after Ellis fired a shot into the floor of the home.

McBride continued testifying that Ellis returned to McBride's home and fired another shot at Thomas. Ellis was about fifty feet away at that point and did not hit Thomas. Ellis ran behind the home but returned and confronted Thomas again. This time, the two men were separated by about the width of a car. According to McBride, Ellis said, "I'm going to kill you," and fired a third shot at Thomas. This shot hit Thomas in the chest. Thomas tried to run, but fell. McBride then testified that Ellis said "I don't care about that nigger," and began threatening another witness, Jonathan Ellis, by saying, "If you testify against me, I'm going to kill you." McBride also testified that the gun Ellis used would misfire every time he tried to shoot it. McBride identified a picture of the gun at trial as the one Ellis used.

Jonathan Ellis testified that Thomas was his stepfather and Ellis was his brother. Like McBride, Jonathan testified that his brother often carried a pistol with a brown handle. He further identified the gun as a .22-caliber revolver pistol. Jonathan also stated that Tyrone Ellis fired twice at Thomas without hitting him and that Thomas fired once in the air. He corroborated McBride's testimony that the final confrontation between the two men occurred outside when the two men were standing on either side of a parked car. Jonathan stated that Ellis walked up and fired once but the pistol snapped, or misfired, so he fired again. A third shot hit Thomas, who said to Jonathan, "He shot me," before falling to the ground. Jonathan added that Ellis said "If I testified against him, he would kill me, too." Jonathan acknowledged that during the final confrontation, Thomas had a gun but was not pointing it at Ellis. He added that after the shooting, Ellis ran off into the woods carrying the gun he had used to kill Thomas.

In addition to the testimony from McBride and Jonathan, Kevin McCray testified that he was at McBride's home on the day Ellis shot Thomas. McCray stated that he knew both Thomas and Ellis prior to the incident. He recalled seeing the two men getting out of Thomas's Blazer sometime after lunch. He testified that they were arguing and that he tried to calm Ellis down by talking to him while they were inside McBride's home. McCray stated that Ellis had a .22-caliber revolver with a brown handle. He added that when he tried to take the gun from Ellis, Ellis snatched it back and fired into the floor of McBride's home. According to McCray's testimony, Ellis told him if he did not "get back he'd kill me too." McCray also reported hearing the gun click several times before it would fire. McCray stated that when Ellis left McBride's home, he was headed toward Thomas with the gun pointed at Thomas. After that, McCray testified that he ran from the home when he heard one or two shots. McCray did not return to the area until law enforcement arrived, at which point he saw Thomas lying on the ground and Ellis running behind McBride's home. McCray identified a picture of the gun at trial as the gun that Ellis had in the house on the day of Thomas's death. McCray finally testified that he heard Ellis say, "I'm going to kill that mother fucker," before Thomas was shot.

Greg Hawley, a deputy sheriff with the Columbia County Sheriff's Office, testified

that he responded to a call on March 14, 2010, at the McBride home. When he arrived, there was a large group of people in the front yard, and McBride informed him that someone had been shot. Hawley stated that McBride told him that the one who "had done the shooting had ran around behind the house." Hawley testified that he and his partner, Deputy Whitaker, began looking behind the house and that Whitaker later arrested Ellis who was found behind the house. Hawley added that he and his partner performed a pat down on Ellis but did not look inside his pockets before placing him in their car.

Michael Richardson, a jailer at the Columbia County Detention Facility, testified that he searched Ellis after he was brought in by the deputy sheriffs. Richardson testified that he found three or four empty .22–caliber cartridges in the pocket of Ellis's blue jeans and that he turned those casings over to a detective at the facility.

Brent McMahen, a criminal investigator with the Columbia County Sheriff's Office, testified that he also responded to the McBride home on March 14, 2010. When he arrived, he was met by several deputies and was told that there had been a shooting. After determining that the victim had been transported to the hospital, McMahen began interviewing people at the scene. He also called for a search dog to begin searching for the weapon that was used. The next day, McMahen recovered a revolver with a brown handle from the woods behind Thomas's home. McMahen identified a picture of the gun at trial as the gun he had recovered from the woods.

McMahen added that there were a number of smudges on the gun but no useable fingerprints were found. Next, he opened the cylinder of the gun and found a number of shells. The revolver in question had six chambers and would hold a maximum of six rounds. McMahen recovered four spent shell casings and one live round from the gun. One chamber in the revolver was empty. The spent shell casings were for a .22–caliber long rifle, while the live round was a Winchester cartridge. All the spent shell casings were branded CCI. McMahen further testified that the .22–caliber long-rifle shells would fit extremely loosely in each chamber, resulting in misfires. McMahen testified that the spent shell casings were the same type and kind as two of the three casings recovered from Ellis's pocket by Richardson at the detention facility. The third casing that Richardson found was also a .22 caliber, but it was a Federal brand, not a CCI.

McMahen testified that he did not try to get fingerprints off the casings during his investigation, and he also admitted that he could not match the gun recovered from the woods to the bullet that killed Thomas. Likewise, Rebecca Mullen, a firearms examiner for the Arkansas State Crime Laboratory, testified that she was unable to determine if the gun found by McMahen was the gun that fired the fatal bullet. Mullen was also unable to confirm if the empty casings recovered from Ellis's jeans pocket were fired from the gun recovered by McMahen.

Adam Craig, a medical examiner with the Arkansas State Crime Laboratory, told the jury that Thomas died as a result of a single gunshot to his chest that pierced through his heart and diaphragm. Craig stated that he recovered a small caliber bullet from Thomas's body. He further testified that, although he could not identify the exact caliber of the bullet recovered, a .22 caliber would be considered a small caliber. Craig determined that the gunshot wound was a noncontact wound.

In his defense, Ellis took the stand and testified that he did not shoot Thomas; that he did not have a firearm on March 14, 2010; and that he did not make any

threats to his stepfather on that date. He also testified that the three empty shell casings removed from his pocket were actually found on the top of a trash can in the backyard of Thomas's home and the jailer never recovered any shell casings from his pocket at the jail. His testimony was that Thomas was upset because he quit a job that Thomas had helped him get. He further testified that he knew Thomas carried a gun with him, but he did not think Thomas would hurt him. According to Ellis, they began arguing, and it quickly escalated until Thomas reached for his gun and Ellis ran behind Thomas's house. Ellis told the jury that Thomas fired several shots at him, but he remained behind the house until he was arrested. He denied having any knowledge about how the gun recovered by McMahen ended up in the woods.

At the end of Ellis's direct testimony, the prosecutor and Ellis's counsel approached the bench. The prosecutor requested permission to inquire into Ellis's prior felony convictions for aggravated assault and second-degree battery and further proposed to confine the questioning to the violent nature of the prior offenses and the fact that both were committed against family members. This examination, according to the prosecutor, would go to credibility.

Ellis's counsel objected to this line of questioning about the prior felonies, because Ellis had already stipulated to his status as a felon. According to defense counsel, the prosecutor was trying to show that because Ellis was previously violent with family members, he was violent on the day in question with Thomas. When asked by the court if the prosecutor was arguing under Rule 404(b), the prosecutor responded that he could but "there are cases that allow this court to use its discretion, prejudicial versus probative." After

that discussion, the circuit court granted the prosecutor's request.

On cross-examination, the prosecutor asked Ellis if he had "previously plead guilty to aggravated assault against a family member where a pistol was used." Ellis responded, "Well, it wasn't a pistol . . . it was labeled a sawed-off shotgun, but it really was a single-barrel twelve gauge and at the time that this happened, I actually wrote my attorney and let him know that I did not pull a gun on my brother." When pressed on the conviction, Ellis said that he "didn't plead guilty to it," but "signed a plea for five years probation." Ellis did admit, however, that he pled guilty to battery in the second degree after getting into a fight with his uncle. When asked again about the shell casings, Ellis maintained that they were not his but that his brother, Jonathan, does a lot of hunting.

On appeal, Ellis first challenges the sufficiency of the evidence. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Williams v. State*, 375 Ark. 132, 135–36, 289 S.W.3d 97, 100 (2008). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.*

As detailed in this opinion, several witnesses testified that they saw Ellis shoot Thomas in the chest after an argument. These witnesses knew Ellis and Thomas prior to the shooting and identified Ellis as the shooter in court. A few of the witnesses were able to describe and identify the gun recovered from the woods behind the crime scene as the same gun Ellis used to shoot Thomas. Furthermore,

two of the shell casings recovered from Ellis's pocket by Richardson were the same size and brand as the shells found inside the gun that the investigator recovered. The medical examiner also testified that the gunshot wound was consistent with a small-caliber gun, such as the .22–caliber gun that the witnesses identified. The medical examiner further testified that Thomas was shot from some distance, which corroborates the eyewitness accounts that Ellis shot Thomas while the two were standing on either side of a car. As an additional point, Ellis stipulated to his status as a felon and also testified concerning his prior felony convictions.

Ellis did testify that he did not shoot Thomas and did not even have a gun in his possession at the time of the murder. The jury, however, is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Turner v. State*, 349 Ark. 715, 724, 80 S.W.3d 382, 388 (2002). The credibility of witnesses is an issue for the jury and not the court. *Id.* This court will disturb the jury's determination only if the evidence did not meet the required standards, thereby leaving the jury to speculation and conjecture in reaching its verdict. *Id.* This court has held that the testimony of one eyewitness alone is sufficient to sustain a conviction. *Page v. State*, 2009 Ark. 112, at 6, 313 S.W.3d 7, 10.

In the instant case, the jury believed the testimony of the eyewitnesses and the testimony of these witnesses identifying Ellis as the shooter was not inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon. *Id.* at 6–7, 313 S.W.3d at 10. Viewing the evidence on appeal in the light most favorable to the State, as we are required to do, *Williams*, 375 Ark. at 135, 289 S.W.3d at 100, we hold that there is substantial evidence to support Ellis's

conviction for first-degree murder and felon in possession of a firearm.

Ellis's second point on appeal is that the circuit court erred in permitting the prosecutor to inquire into the nature of his prior felony convictions. According to Ellis, the court erred because it failed to make a finding that the prior offenses were more probative than prejudicial under Arkansas Rule of Evidence 609. He claims that because he had stipulated that he was a felon, permitting the State to inquire into the nature of the violent felonies that involved family members was more prejudicial than probative.

This court reviews the admission of evidence by the circuit court at trial using an abuse-of-discretion standard. *O'Neal v. State*, 356 Ark. 674, 683, 158 S.W.3d 175, 181 (2004). The decision to admit or exclude evidence is within the sound discretion of the trial court, and we will not reverse a court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Morris v. State*, 358 Ark. 455, 458, 193 S.W.3d 243, 246 (2004) (citing *Martin v. State*, 354 Ark. 289, 119 S.W.3d 504 (2003)).

Rule 609 covers impeachment of witnesses and provides, in relevant part:

For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or a witness, or (2) involved dishonesty or false statement, regardless of the punishment.

Ark. R. Evid. 609(a) (2010). The State does not dispute that Ellis's prior convictions do not involve dishonesty or false

statement, and Ellis does not dispute that the prior felony convictions at issue fall within the time constraints imposed by Rule 609. Moreover, Ellis does not contest that both convictions were punishable by imprisonment in excess of one year under Arkansas law. Instead, he focuses on "subsection (a)(1)" of Rule 609 and urges that the court failed to find that the convictions were more prejudicial than probative.

During the trial, the court heard argument from both the State and Ellis's counsel regarding the admissibility of Ellis's prior convictions. The following colloquy occurred outside the hearing of the jury:

> STATE: Your Honor, the defendant has now testified. [The defendant] stipulated that [he] has been convicted of a felony ... the defendant has been convicted of two felonies for which this court has sent him to prison. The first felony is Aggravated Assault. The second felony offense is Second Degree Battery.
>
> We would like permission of the court to allow us to inquire at least as to the nature of the two felony convictions and that they are violent in nature, both involving family members. We would not go any further than that ... We think this is discretionary with the court.
>
> COURT: And what does that go to?
>
> STATE: Credibility.
>
> COURT: Credibility?
>
> STATE: His credibility.
>
> . . . .
>
> COUNSEL: But, in any event, as I understand the purpose of that rule that allows impeachment for a conviction of a felony, it has to do with credibility. The rules say that just by virtue of being convicted, it's got to be considered from a credibility standpoint, unless it's one of the particular things such as something involving fraud or deceit or something like that or perjury.... So, as far as

what I think the jury is entitled to know from a credibility standpoint is the fact that he has been convicted of a felony and it ends there.... In this case, what's going to be argued as I understand it, is because somebody acted a certain way in the past, that should be used as a reason to find them guilty this time. That's exactly what they are trying to avoid by those particular rules.

> . . . .
>
> COURT: Is this 404(b)?
>
> STATE: The fact is, these are violent offenses. I suppose under 404(b) you could argue that in his case based on his testimony—
>
> COUNSEL: I have read it already, but I just can't remember the number.
>
> STATE: There are cases that allow the court to use its discretion, prejudicial versus probative. In this case, we think it certainly attacks his credibility....
>
> COURT: All right. You may be permitted to do that.
>
> COUNSEL: I guess I will officially object for the record.

This court has held that the circuit court has considerable discretion in determining whether the probative value of prior convictions outweighs their prejudicial effect under Rule 609, and that decision will not be reversed absent an abuse of discretion. *Turner v. State,* 325 Ark. 237, 242, 926 S.W.2d 843, 846 (1996). The admissibility of the prior convictions must be decided on a case-by-case basis. *Id.* When a defendant chooses to testify, this court has consistently permitted prior convictions to be used for impeachment purposes even where those convictions are similar to the charge or charges before the court. *Id.* Factors to consider in making the probative/prejudicial analysis include the impeachment value of the prior crime, the date of the conviction and the defendant's subsequent history, *the similarity*

*between the prior conviction and the crime charged,* the importance of the defendant's testimony, and the *centrality of the credibility issue. Schalski v. State,* 322 Ark. 63, 66–67, 907 S.W.2d 693, 695 (1995) (emphasis added).

In *Turner,* the appellant was convicted of burglary and attempted rape based on the testimony of the fourteen-year-old victim and her mother. *Id.* at 239, 926 S.W.2d at 844. There was no physical evidence introduced to link the appellant to the crime, and he denied his participation in the crime altogether. *Id.* at 243, 926 S.W.2d at 846–47. On cross-examination by the State, the appellant admitted that he had prior convictions for burglary and felony attempt to commit sexual abuse in the first degree, but he argued that in those cases the trial court had misled him. *Id.* at 237, 926 S.W.2d at 845. Immediately following that admission, the court instructed the jury to use this evidence only for the purpose of judging credibility and not as evidence to determine his guilt.

On appeal, the appellant argued that the trial court erred in allowing the State to cross-examine him regarding his prior convictions. This court disagreed and found that because the appellant had testified, his credibility was a central issue in the case and, viewed in that light, his prior convictions were extremely probative. *Id.* at 243, 926 S.W.2d at 847. This court held, as a result, that the trial court did not abuse its discretion in permitting inquiry into the prior convictions. Furthermore, this court held that there is no justification for disallowing the use of crimes, even ones of a unique nature, for the purposes of attacking the credibility of a defendant who takes the stand. *Turner,* 325 Ark. at 243, 926 S.W.2d at 847.

In still another case, the appellant was charged with rape. *See Benson v. State,* 357 Ark. 43, 160 S.W.3d 341 (2004). Prior to trial, the appellant filed a motion in limine to exclude any mention of his prior felony convictions for rape, kidnapping, and aggravated robbery on the basis that those convictions were more prejudicial than probative. *Id.* at 45, 160 S.W.3d at 342. The trial court denied the motion and a jury subsequently convicted the appellant of rape and sentenced him to life imprisonment. *Id.* at 45, 160 S.W.3d at 342–43. On appeal, he challenged the trial court's ruling on his motion in limine, arguing that his prior convictions were clearly more prejudicial than probative under Rule 609. Although this court affirmed the circuit court's decision, what is most important for the purposes of the instant case is that this court noted that "[i]n denying [appellant]'s motion in limine in the case *sub judice, the trial court weighed the probative value of the appellant's prior convictions against any possible prejudice* and concluded that should he take the stand, his prior convictions could be used against him for impeachment purposes." *Id.* at 48, 160 S.W.3d at 344 (emphasis added).

Similar to the appellants in *Turner* and *Benson,* the appellant in *Schalski* asserted that the trial court's ruling allowing the state to impeach his credibility during his trial for rape by introducing evidence of his previous conviction for false imprisonment was in error. *Schalski,* 322 Ark. at 65, 907 S.W.2d at 695. Rather than reviewing any specific findings by the circuit court, this court held that the appellant's prior crime of false imprisonment was dissimilar in nature to the crime of rape. *Id.* at 67, 907 S.W.2d at 696. Moreover, because the only evidence was the testimony of the victim and of the appellant, this court determined that the appellant's credibility was a critical issue during the trial. *Id.* Thus, this court determined that the ruling permitting inquiry into the prior conviction was not an abuse of discretion. *Id.*

In the instant case, the circuit court made its ruling after hearing arguments from both the prosecutor and defense counsel regarding the probative-versus-prejudicial nature of the prior convictions. Unlike the circuit court in *Turner*, the circuit court in Ellis's case did not instruct the jury that Ellis's prior convictions could only be considered for the purposes of determining credibility, and Ellis's counsel did not request an instruction to that effect. Although the circuit court did not explicitly state that the prior crimes were more probative than prejudicial under Rule 609, it is clear from the record that the court determined that to be the case. The prosecutor described the test under the rule as "probative versus prejudicial," and defense counsel told the court that determining credibility was the purpose for the rule. The court then allowed cross-examination based on the prior felonies. As long as it is clear from the record, as it is in this case, that the trial court determined that the probative value outweighed the potential for unfair prejudice, Rule 609 is satisfied.

Our circuit courts are afforded wide discretion in determining whether a prior conviction is more probative than prejudicial. Ellis's prior convictions were for violent crimes and involved family members as the targets of his violence. The evidence in this case consisted primarily of the testimony of eyewitnesses and Ellis himself. In prior cases where the evidence consists of witness or victim testimony and the testimony of the accused, this court has steadfastly held that the accused's credibility is critical and, therefore, prior convictions are highly probative. *See Smith v. State*, 2009 Ark. 453, 343 S.W.3d 319; *Benson*, 357 Ark. 43, 160 S.W.3d 341; *Turner*, 325 Ark. 237, 926 S.W.2d 843; *Schalski*, 322 Ark. 63, 907 S.W.2d 693.

The admissibility of prior crimes for impeachment purposes is determined on a case-by-case basis. *See Turner*, 325 Ark. at 242, 926 S.W.2d at 846. Inquiry into those crimes is not unlimited. *See, e.g., Floyd v. State*, 278 Ark. 342, 347, 645 S.W.2d 690, 693 (1983) (holding that when the accused takes the stand, the jury can be made aware of the number and nature of prior convictions within the restrictions of Rule 609, but that some impermissible details must remain undisclosed). In the instant case, however, the prosecutor's cross-examination on the prior felonies was limited to determining the type of crime, whether a weapon was used, and Ellis's relationship to the victim. Because the inquiry was limited, the evidence in this case clearly fell within the parameters of Rule 609. In light of our prior case law, we cannot say this was an abuse of discretion by the circuit court.

Pursuant to Arkansas Supreme Court Rule 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found.

Affirmed.