

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR–13–783

| | |
|---|---|
| XAVIER THOMAS<br>APPELLANT | **Opinion Delivered** September 24, 2014 |
| V. | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT<br>[NO. CR2012-51-5] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE JODI RAINES DENNIS, JUDGE |
| | AFFIRMED |

## RITA W. GRUBER, Judge

Appellant Xavier Thomas was convicted by a jury of first-degree murder and attempted first-degree murder and sentenced to 44 years' imprisonment. On appeal, appellant contends that the trial court erred in (1) denying his motion for directed verdict; (2) finding that the door had been opened to allow the State to cross-examine him about prior convictions; and (3) denying him his Sixth Amendment right to the counsel of his choice. We find no error, and we affirm his convictions.

Testimony at trial revealed the following. On October 25, 2011, appellant met the victims, Paul Fells and Thristian Hunter, outside the Sunset Village Apartments in Pine Bluff, where the victims had been hanging out and drinking. Hunter testified that he had never met appellant but that appellant was introduced as Zay. He said that Zay hung out with them and that he saw Zay show a chrome gun with a black handle to someone named Maurice. Hunter said that Zay left but then kept calling Fells's cell phone "over and over and over and over."

Fells did not answer it, but he told Hunter that it was Zay calling. While Fells and Hunter were walking toward Fells's sister's house, Zay showed up again and asked Fells why he did not answer his phone. According to Hunter's testimony, Fells told Zay that he did not hear it ring. Fells, Hunter, and appellant then walked to the liquor store together. While walking, Zay's phone began ringing over and over. Zay answered it and, according to Hunter, told the caller that he was "fixing to handle some business." He then told Fells and Hunter that he had to check his gun. He took it out, checked it, put it back, and then started shooting. Hunter testified that Zay was several feet away from Fells and that he shot Fells in the head. Fells did not survive his injuries. Hunter said that Zay then started shooting Hunter, who ran. Hunter was shot five times while trying to escape.

Officer Ryan Edwards of the Pine Bluff Police Department testified that he was called to investigate a possible prowler near Sunset Village Apartments. While on his way there, he was flagged down by someone who alerted him to Hunter, lying in a nearby yard. Hunter told Officer Edwards about Fells, who was leaning against the brick wall of a nearby duplex.

Detective Michael Roberts testified that he responded to a call about the shooting and spoke with Hunter at the scene. Hunter told Detective Roberts that the shooter was a light–skinned male with a bunch of tattoos and "messed-up teeth." Hunter also told him that the shooter's phone number should have been in Fells's cell phone because he had just called Fells before the shooting.

Detective Jacqueline Stevenson testified that she spoke to Hunter in the hospital room two days after the shooting. Hunter gave her the same description of the shooter that he had

given to Detective Roberts. She brought Hunter several photo lineups, but he was unable to identify the shooter. Hunter later attempted to contact the Pine Bluff police to speak to a detective, and Detective Larry Gailey returned his call on November 3, 2011. Hunter told Detective Gailey that the shooter was known to him only as Zay or Nardo. Again, Hunter was unable to identify the shooter from a photo lineup provided by Detective Gailey. Detective Stevenson visited Hunter at his home a few days later and showed him several more photo lineups, but Hunter could not identify the shooter. Finally, on December 12, 2011, Detective Stevenson showed him another photo lineup, the eleventh one, and Hunter instantly identified appellant as the man who had shot him and who had shot and killed Fells. Appellant's photo had not appeared in any of the previous photo lineups shown to Hunter.

Detective Stevenson testified that she arrived on the scene to investigate the shooting at approximately 9:06 p.m. She also said that, according to Hunter, the last person to call Fells on his cell phone was the shooter. She testified that the last missed call on Fells's cell phone was from someone identified on the phone as "X" at 8:41 on the night of the shooting. There were at least five missed calls from X between 6:39 and 8:07 to Fells's phone.

Finally, Hunter identified appellant in the courtroom at trial as the man who had shot Fells and him on October 25, 2011. He testified that he was "1,000 percent certain that that's the individual that shot me." The jury found appellant guilty of first-degree murder of Fells and attempted first-degree murder of Hunter.

I.

For his first point on appeal, appellant contends that the trial court erred in denying

3

SLIP OPINION

his motions for directed verdict on both counts. Appellant argues that the State failed to prove the elements of the two crimes or that he was the person who shot the victims. The issue on appeal is whether there is substantial evidence to support the verdict. *LeFever v. State*, 91 Ark. App. 86, 88–89, 208 S.W.3d 812, 815 (2005). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Kaufman v. State*, 2013 Ark. 126, at 4. Witness credibility is an issue for the jury, which is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence. *Baughman v. State*, 353 Ark. 1, 5, 110 S.W.3d 740, 743 (2003). Our supreme court has held that the testimony of one eyewitness alone is sufficient to sustain a conviction. *Ellis v. State*, 2012 Ark. 65, at 9, 386 S.W.3d 485, 490. Finally, when the sufficiency of the evidence is challenged, we consider only the evidence that supports the verdict, viewing it in the light most favorable to the State. *LeFever*, 91 Ark. App at 89, 208 S.W.3d at 815.

A person who causes the death of another person with purposeful intent commits first–degree murder. Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2013). A person acts purposely with respect to his conduct when it is his conscious object to engage in conduct of that nature to cause such a result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). The law presumes that a person intends the natural and probable consequences of his actions. *Dunn v. State*, 371 Ark. 140, 146, 264 S.W.3d 504, 508 (2007).

In this case, Hunter, an eyewitness, unequivocally identified appellant in a photo lineup



and at trial as the person who shot Fells and him. The weighing of evidence lies within the province of the jury, and we are bound by its determination regarding the credibility of witnesses. *Harmon v. State*, 340 Ark. 18, 24, 8 S.W.3d 472, 476 (2000). After a jury has given credence to a witness's testimony, we will not disregard it unless it was "so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon." *Williams v. State*, 351 Ark. 215, 223, 91 S.W.3d 54, 58 (2002). One eyewitness's testimony is sufficient to sustain a conviction. *Id*. Hunter was at the scene, spent time with appellant, and was within feet of the shooter when the event occurred. His testimony is not so inherently improbable, physically impossible, or clearly unbelievable that reasonable minds could not differ thereon. Considering only the evidence that supports the verdict and viewing the evidence in the light most favorable to the State, we hold that substantial evidence supports the jury's verdict.

## II.

For his second point on appeal, appellant claims that the circuit court erred in finding that the door had been opened for the State to inquire about appellant's previous incarceration. He argues on appeal that the fact that he was previously incarcerated was inadmissible under Rules 403 and 404(b) of the Arkansas Rules of Evidence, as the evidence was clearly more prejudicial than probative. The State responds, claiming that appellant failed to preserve this argument for appeal, and, if preserved, the court did not err because evidence of prior convictions is allowed for impeachment purposes if a defendant chooses to testify.

We turn to the events surrounding appellant's argument. During appellant's counsel's



cross-examination of Hunter, the following exchange occurred:

> APPELLANT'S COUNSEL: Do you want to tell the Court if anything else was going on that night that had y'all in that yard and not in that street?
>
> HUNTER: Walking to the—walking to the store to get some—more liquor.
>
> APPELLANT'S COUNSEL: Okay. And that's all that was going on, and that's your testimony?
>
> HUNTER: Uh-huh. I don't know why he started shooting. It's—I ain't going to lie. It scared me though because it came out of the blue because I thought he was just— I thought they was—thought they was cool the way they were talking. They was talking like they—like talking like they was locked up together or something like, — it was something about jail and all that, like they was locked up together. And he didn't say too much though. He kept his low profile.

Appellant did not object to this testimony, but at the conclusion of his cross-examination, his counsel asked for a bench conference, where he argued to the court that this colloquy did not "open the door" for the State to question appellant about his criminal history. The State said it had no intention of pursuing this line of questioning with Hunter but responded that it believed the door was open regarding the relationship between appellant and Fells and indicated that if appellant "took the stand," it would be "a different situation." The court stated that if appellant took the stand, "the door is open."

We hold that appellant's argument on appeal was not properly preserved. On appeal, appellant argues that the court erred in determining that the State would have been allowed to question him about his criminal history if he had taken the stand because the evidence would be more prejudicial than probative under Rule 404(b) of the Arkansas Rules of Evidence. It was his own counsel who elicited information from Hunter about the possible prison relationship between Fells and appellant, albeit unintentionally; the State did not pursue

the line of questioning with Hunter; appellant's counsel did not at any time mention to the trial court either Rule 404(b) or argue that the testimony would be more prejudicial than probative; appellant made no specific argument to the court regarding the nature of the criminal history; and appellant did not take the stand. *See Riley v. State*, 2012 Ark. 462 (holding that a party cannot enlarge or change the grounds for an objection on appeal, but is bound by the scope and nature of the arguments made at trial and that an argument is not preserved for appellate review unless the trial court rules on the specific objection raised by appellant).

## III.

Finally, appellant contends that the trial court denied him his Sixth Amendment right to his choice of counsel. Although a defendant's right to counsel of choice is constitutionally guaranteed, the right to counsel of one's choosing is not absolute and may not be used to frustrate the inherent power of the court to command an orderly, efficient, and effective administration of justice. *Bullock v. State*, 353 Ark. 577, 582, 111 S.W.3d 380, 384 (2003). Moreover, once competent counsel is obtained, any request for a change in counsel must be considered in the context of the public's interest in the prompt dispensation of justice. *Id*. Additionally, once an appellant has accepted representation by an attorney, the fact that he is dissatisfied with his counsel's efforts does not entitle him to appointment of a different attorney. *Id*.

In this case, in a hearing on March 7, 2012, appellant informed the court that he would hire an attorney with the help of his family, and the court gave him an additional month to

7

accomplish this. On April 9, 2012, appellant appeared in court without an attorney, stating that he had not been able to talk with an attorney and that he did not have income or property to sell to pay for one. The court then appointed in succession two public defenders who withdrew for conflict reasons. Finally, Efram Neely was appointed on August 3, 2012. Appellant's trial date was continued several times at his request, but appellant did not ask for new counsel or express a desire to hire private counsel. Two days before trial, on June 17, 2013, the following exchange occurred:

THE COURT: Okay, Mr. Thomas, would you stand up and tell me what the—is what's going on. You want to—I—we appointed you—stand up for me so you can answer my questions. We appointed you the Office of Public Defender, and Mr. Neely has been assigned to your case. The Court is—is he correct in stating that you're wanting to find your own attorney?

APPELLANT: Yes, Your Honor.

THE COURT: Okay. Well, of course, you can always hire your own attorney. The problem is, I don't think you'd be able to hire someone who would be ready to go to trial when we're going to start this case, which is Wednesday, I believe.

Now if you're saying you want a new public defender, well, the Court does not assign a particular attorney to a case. The Public Defenders Commission assigns attorneys, and so I would not exchange Mr. Neely for another public defender.

APPELLANT: He don't even want to—he don't even want to do my case. Why—why do I got to go to trial with him?

THE COURT: Well, because that's who they have assigned your case to. He is, I guess, a conflicts attorney with the Public Defenders Commission. So I'm sure he's—is willing to take your case to trial. He has already told us he's willing and ready to go. So—

MR. NEELY: Your Honor, on the previous hearing, we talked about affidavits. Mr.— we have done everything we're supposed to do. We have filed an affidavit. We have got service on his witness that he reports. We have filed all appropriate motions. We went through discovery. We have provided Mr. Thomas with discovery. We have

8

told Mr. Thomas the pros and cons. He knows the extent of the possible punishment for what he is charged with. He knows the—the difference between what the plea offer and what he is facing in a trial. We have explained all this to Mr. Thomas.

And—and the only thing we have done is let Mr. Thomas make his decision after completely informing him of the pros and cons of going to trial with—with the evidence and—pleading. And that is all that counsel has done at this point.

I am—I will be prepared—I am prepared to proceed in the trial if that is what Mr. Thomas desires. But I have explained to Mr. Thomas through the evidence, you know, just where we are with a trial. And that is just for the record purposes.

THE COURT: Okay. And usually, from my experience, Mr.Thomas, is the reason many defendants are not happy with their defense attorney is that they haven't gotten the plea offer that they would prefer. But I want to explain to you that plea offers are within the decision-making power of the prosecuting attorney. And the—whatever they have offered you, if you don't want to accept that, then that is well within your rights and you can say, No, I don't want to take that, and we'll go to trial.

But your—neither your attorney nor I have the authority to tell the State, Well, I'm sorry; you need to do better than this. I mean, that's just not how it works.

So I see what—what the State has offered you. I've been given a copy of that. And if that—apparently, a total of 25 years in the Department of Correction. And if that is not what you want, say no, and we'll have a jury called in and we will take it to a jury and see what a jury decides. First, whether or not you're even guilty. And if they find you guilty of something, what they would recommend and suggest as your sentence. Okay?

Anything—what else do you need to tell me?

APPELLANT: I just want to say I don't want to go with him and I don't want—I don't want to take that.

Although appellant technically neither moved to relieve his counsel nor to continue the case, we will uphold rulings on both of those motions in the absence of an abuse of discretion. *Bullock*, 353 Ark. at 581, 111 S.W.3d at 383; *Smith v. State*, 2012 Ark. App. 613. On appeal, appellant contends that we should treat his request for change of counsel as a

9

motion for continuance. An appellant must also demonstrate that, as a result of the ruling on the motion for a continuance, he suffered prejudice that amounts to a denial of justice. *Smith*, 2012 Ark. App. 613, at 3. When a motion for continuance has been denied and there is an issue of denial of the right to counsel, the issue must be decided on a case-by-case basis. *Thorne v. State*, 269 Ark. 556, 561, 601 S.W.2d 886, 889 (1980). Factors that a trial court may consider when ruling on a request for a continuance to obtain a new attorney include the reasons for the change, whether counsel has been identified, whether the defendant has been diligent in seeking the change, and whether any prejudice is likely to result to the defendant if the motion is denied. *Smith*, 2012 Ark. App. 613, at 3.

In this case, the only reason apparent from the record that appellant wanted a new attorney is that he did not like the plea offered. He gave no other reason. In addition, appellant was provided ample opportunity—over a year—to secure his own counsel but did not. Moreover, he did not alert the court to his desire until two days before trial after several continuances. This was over a year after he first told the court he would obtain private counsel and then indicated that he had no money to do so. Finally, when he informed the court that he did not want Mr. Neely to represent him, he had not identified anyone to replace him. Indeed, he did not indicate that he was attempting to find new counsel. He merely stated that he did not like Mr. Neely. His right to his choice of counsel may not be used to frustrate the inherent power of the court to command an orderly, efficient, and effective administration of justice. The court balanced appellant's right to different counsel with its own need to efficiently administer justice. We hold that appellant's dissatisfaction with

 

his lawyer was not a violation of his Sixth Amendment right to counsel and that the trial court did not abuse its discretion.

Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Snively Law Firm*, by: *Nick Churchill*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Ashley Argo Priest*, Ass't Att'y Gen., for appellee.